## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**JACQUELYN PARKER,**                   :

             **Plaintiff,**             :      **CIVIL ACTION NO. 3:20-427**

        **v.**                          :            **(JUDGE MANNION)**

**CORRECTIONAL CARE, INC., et**         :
**al.,**
                                        :
             **Defendants.**

## <u>MEMORANDUM</u>

Presently before the court is defendants' motion for summary judgment. (Doc. 36). The defendants filed a Statement of Material Facts, (Doc. 39), and a brief in support of their motion, (Doc. 40). The plaintiff filed a brief in opposition, (Doc. 46). Then, the defendants filed a reply brief, (Doc. 48). The matter is now ripe for disposition.

### I.    BACKGROUND[1]

On May 24, 2018, Jacquelyn Parker ("Parker") committed herself to a rehabilitation center, Just Believe Recovery Center of Carbondale ("Just Believe"). When Parker entered Just Believe, she was given a pregnancy

---

[1] The facts set forth herein are derived from defendants' Statement of Material Facts, (Doc. 39), and plaintiff's Answer to the Statement of Facts, (Doc. 47).

test, which returned a negative result. At Just Believe, Parker was prescribed psychotropic medication, which could alter her menstrual cycle. Parker stated that she last had sexual intercourse approximately two weeks prior to entering Just Believe. After exiting Just Believe, Parking was committed to Lackawanna County Prison on June 14, 2018. Upon entering the prison, Nurse Ruth Coulthard received a medical history and initial screening from plaintiff. Parker stated she was not pregnant and that her last menstrual period was June 7, 2018. Parker was not given a pregnancy test by any medical staff upon entry into the prison.

On June 22, 2018, Parker went to the Prison medical department for "c/o abnormal bleeding patterns. States for 2 wks she had been bleeding off & on like a normal period. She feels cramping in vaginal area. Told I/m to save pads & show us." (Doc. 47, ¶16). Over the telephone, Dr. Zaloga prescribed Motrin for pain and pads for five days. Dr. Zaloga did not order a pregnancy test. While the medical sheet says to save the pads and show them to medical, Parker insists she was never informed to save the pads and show them to medical.

After the consultation on June 22, 2018, plaintiff explains that she communicated to the nursing staff working the medical cart that she was in severe pain almost every time she encountered them. Plaintiff states that

she told them about her bleeding, pain in her stomach, vagina, and legs. From June 22, 2018 until July 19, 2018, plaintiff claims she submitted medical call slips and placed them in the request box four to five times per week. She even complained to the nursing staff about not being seen by medical and was told to keep putting request slips in. According to defendants, Dr. Zaloga and Nurse Practitioner Anthony Iannuzzi were unaware of any complaints between June 22, 2018 until July 19, 2018.

On July 19, 2018, Parker was seen by medical after reporting vomiting for three days and pain in her right side that was tender to the touch according to CCI nurse Wombacker. Parker was administered a pregnancy test, which came back positive, and a urine test, which came back positive for a urinary track infection ("UTI"). Parker was placed on pregnancy restrictions, given prenatal medications, and an antibiotic for her UTI. Mr. Iannuzzi prescribed the medication and placed Parker on the pregnancy restrictions, but did not physically examine her nor speak with her about her symptoms. Parker was told to return to her cell for the night.

The next morning, on July 20, 2018, Parker woke up in severe pain, vomiting, sweating, and a lack of responsiveness. Prison officials and nursing staff came to her cell and brought her to medical around 12:30 p.m.

A telephone call was placed to Dr. Zaloga, where he had Parker immediately transferred to Moses Taylor Hospital.

Upon arrival at the hospital, it was discovered that a ten-week ectopic pregnancy existed. Parker underwent surgery for a left salpingo-oophorectomy for a ruptured left ectopic pregnancy. Parker had her left fallopian tube and ovary removed during the surgery.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party must do more than simply show that there is some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  However, if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant]

will bear the burden of proof at trial, Rule 56 mandates the entry of summary judgment because such a failure necessarily renders all other facts immaterial. Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

### III.  DISCUSSION

#### a. Negligence

Defendants first argue a claim of medical malpractice in Pennsylvania requires the testimony of a qualifying medical expert. Federal courts have held that Section 512 of the Pennsylvania Medicare Care Availability and Reduction of Error ("MCARE") Act is a rule of witness competency. Keller v. Feasterville Family Health Care Ctr., 557 F. Supp.2d 671, 684 n.3 (E.D. Pa. 2008). Under Federal Rule of Evidence 601, state law controls the evaluation of a witness' competency in federal diversity cases. Fed. R. Civ. P. 601; Keller, 557 F. Supp.2d at 684 n.3. Section 512(c) of the MCARE Act states:

> **(c) Standard of care.--** In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:
> > (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.
> > (2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

- 6 -

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

**(d) Care outside specialty.--** A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

**(e) Otherwise adequate training, experience and knowledge.--** A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. §1303.512. The defendants argue that plaintiff's medical expert, Dr. Jubanyik, is not able to testify to the standard of care in this case. To testify to the standard of care, the plaintiff's expert must be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care. Plaintiff presents her medical expert, Dr. Jubanyik, an associate professor in the Department of Emergency Medicine at Yale University and a Board-Certified physician in Emergency Medicine. Dr. Jubanyik is substantially familiar with the applicable standard of care for ectopic pregnancies as she has experience

in evaluation, diagnosis, and treatment of women of childbearing age presenting with abnormal vaginal bleeding and pain.

Next, defendants contend that Dr. Jubanyik is not in the same specialty or subspecialty as Dr. Zaloga. While this is true, 512(d) provides an exception to the requirements of 512(c)(2). Dr. Jubanyik is trained in the diagnosis or treatment of the condition of ectopic pregnancies. (Doc. 47, ¶44). Dr. Zaloga is a nephrologist and internist that provided care to Parker for her ectopic pregnancy. Defendants do not claim that Dr. Zaloga's specialty or competence included the treatment of ectopic pregnancies. Thus, this specific type of care was not within his specialty or competence.

The court could similarly find Dr. Jubanyik competent to offer expert testimony under 512(e). Section 512(e) requires, "the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period." 40 P.S. §1303.512(e). "[T]he "relatedness" of one field of medicine to another, under subsection 512(e), can only be assessed with regard to **the specific care at issue."** Vicari v. Spiegel, 989 A.2d 1277, 1284 (2010) (emphasis in original). The specific care at issue in this case is a female of childbearing age presenting with abnormal vaginal bleeding and

pain. As plaintiff correctly points out, the evaluation of this specific care issue is not a unique presentation that one sees as a nephrologist, internist, OB-GYN, or emergency room physician. Defendants' attempt to utilize the specialty of Dr. Zaloga in order to prevent the testimony of Dr. Jubanyik, but the specific care at issue in this case is not unique to Dr. Zaloga's specialties.

Defendants argue that Dr. Jubanyik's testimony should be excluded because she is not familiar with the standard of care in a correctional context. However, this argument is wholly unsupported by case law. There is nothing to indicate that the "standard of care for the specific care at issue" changes depending upon the setting the care takes place in. Defendants do not identify where in the statute or caselaw the "setting" of the care reshapes the applicable standard of care.

Thus, Dr. Jubanyik is qualified to testify under the MCARE Act regarding the applicable standard of care.

Next, defendants argue that Dr. Jubanyik does not offer an opinion to a reasonable degree of medical certainty that would support a conclusion that an earlier diagnosis of ectopic pregnancy would have led to a different outcome. In Hamil v. Bashline, the Supreme Court of Pennsylvania explained the required level of certainty a medical expert must express when testifying in an increased risk of harm case. 392 A.2d 1280 (Pa. 1978). The

court explained that an increased risk of harm theory inherently involves the weighing of probabilities of what might have happened. Id. at 1288. While a medical expert can testify to a lesser degree of certainty pertaining to the potential outcome (meaning a more likely than not standard), the medical expert is still required to testify to a reasonable degree of medical certainty that the defendant's conduct increased the risk that the harm would have occurred. Id. at 1288-89. As such, Dr. Jubanyik expressed with a reasonable degree of medical certainty that "Dr. Zaloga and Mr. Iannuzzi violated the standard of care in their medical care to Ms. Parker and this violation led to the traumatic and unnecessary complication of a ruptured ectopic pregnancy that required life-saving emergency surgery." (Doc. 36-15).[2] Plaintiff presents an expert opinion that testifies to a reasonable degree of medical certainty that the defendants' failure to follow the standard of care resulted in an increased risk where Parker went from an unruptured ectopic pregnancy to a ruptured ectopic pregnancy requiring emergency surgery.

Defendants contend that Dr. Jubanyik's use of "more likely than not" in the context of using methotrexate to prevent surgery for the ectopic pregnancy does not meet the requirements of Hamil. To the contrary, Dr.

---

[2] Dr. Jubanyik indicates in her prepared materials that all of her opinions are expressed with a reasonable degree of medical certainty.

Jubanyik's testimony pertains to the likelihood of an alternative outcome that more likely than not would have occurred had defendants exercised the proper standard of care. Hamil explains that under Section 323(a) of the Restatement (Second) of Torts (1965) when a plaintiff claims an increased risk of harm theory the expert witness can testify to the likelihood of what would have happened in the defendant performed his service according to the standard of care. Hamil, 392 A.2d at 1288 ("To resolve such a claim a fact-finder must consider not only what Did occur, but also what Might have occurred, i. e., whether the harm would have resulted from the independent source even if defendant had performed his service in a non-negligent manner. Such a determination as to what Might have happened necessarily requires a weighing of probabilities."). The expert witness is permitted to testify to the probability of an alternative outcome had the standard of care been followed. Id. (allowing the doctor witness to testify to the percentage probability of the patient's outcome had the proper standard of care been followed).

Defendants then argue that Dr. Jubanyik cannot offer expert testimony for the negligence claim against Mr. Iannuzzi as it would be "fundamentally unfair to permit an Emergency physician to criticize a nurse practitioner who provides care in a prison setting." (Doc. 40, p.19). Defendants admit that the

requirements of Section 512(c) of the MCARE Act do not apply to Mr. Iannuzzi.  Defendants again argue that the prison "setting" impacts whether or not Dr. Jubanyik can testify to the standard of care required of a nurse practitioner.  However, defendants again fail to cite any case law supporting their "setting" argument. To the contrary, "Pennsylvania courts have permitted physicians to testify as to a nurse's standard of care, provided Pennsylvania's evidentiary rules pertaining to expert witness qualifications are satisfied. Petrancosta v. Malik, No. 3:12-CV-00677, 2015 WL 12516203, at *4 (M.D. Pa. Jan. 27, 2015), report and recommendation adopted sub nom. Pentrancosta v. Malik, No. 3:12-CV-00677, 2015 WL 12513527 (M.D. Pa. Feb. 17, 2015) (citing Rettger v. UPMC Shadyside, 991 A.2d 915, 930 (Pa. Super. 2010)); c.f. Yacoub v. Lehigh Valley Med. Assocs., P.C., 805 A.2d 579, 592 (2002) (finding that a neurosurgeon could not testify to the standard of care for nurses working in internal medicine because he could not remember the last time he worked with nurses in an internal medicine unit, was not board certified in internal medicine, and did not have any experience related to internal medicine.) As the court has already addressed Dr. Jubanyik's qualifications as an expert witness pertaining to the specific care at issue in this case, defendants have not presented any argument supported by law that would disqualify Dr. Jubanyik.

Defendants next argue that the negligence in Count II against CCI must be dismissed if the negligence claims against Dr. Zaloga and Mr. Iannuzzi are dismissed. As addressed above, the claims against Dr. Zaloga and Mr. Iannuzzi will not be dismissed. Pennsylvania's Supreme Court explained that a physician expert witness testifying to the nurses breaching the standard of care was "sufficient to support a *prima facie* claim of corporate negligence for [defendant's] failure to oversee all persons who practice medicine within its walls as to patient care." <u>Welsh v. Bulger</u>, 698 A.2d 581, 586 (Pa. 1997). Further, in <u>Whittington</u> "the Pennsylvania Superior Court attributed a series of individual failures to the defendant hospital, and then held that the hospital had constructive notice because, had it undertaken adequate monitoring, 'it would have discovered that decedent had received and was continuing to receive medical treatment that was clearly deficient.'" <u>Hernandez-Anguera v. Main Line Hosps., Inc.</u>, No. 12-6645, 2014 WL 12605468, *1 (E.D. Pa. Apr. 10, 2014) (citing <u>Whittington v. Episcopal Hosp.</u>, 768 A.2d 1144, 1150-54). Then, in <u>Thompson</u>, "The Pennsylvania Supreme Court held that the plaintiff's claim survived summary judgment on the basis that, according to the evidence, hospital staff had been aware of the plaintiff's deteriorating condition but failed to report it or question her treating physician's inappropriate orders, which they had a duty

to do." Hernandez-Anguera, 2014 WL 12605468, *1 (E.D. Pa. Apr. 10, 2014) (citing Thompson v. Nason Hosp., 591 A.2d 703, 709 (Pa. 1991)).

Plaintiff then presents the testimony of Dr. Jubanyik to suggest institutional failure. Dr. Jubanyik presents expert testimony that both Dr. Zaloga and Mr. Iannuzzi violated the standard of care for plaintiff. (Doc. 36-15). Then, Dr. Jubanyik explains how the plaintiff suffered a ruptured ectopic pregnancy due to the violation of the standard of care. (Doc. 36-14). Plaintiff's expert specifically explains how the failure to administer a pregnancy test to plaintiff on June 22, 2018 is a failure of the standard of care. (Doc. 36-15). Plaintiff also argues that even after a pregnancy test was administered on July 19, 2018, the standard of care was again violated by a failure to immediately send her to the emergency room for an evaluation for an ectopic pregnancy given her history of pain and vaginal bleeding. (Doc. 36-14). Furthermore, plaintiff explains that between June 22, 2018 and July 19, 2018, she verbally communicated to nurses her pain and submitted medical call slips four to five times per week requesting to be seen by medical. (Doc. 47, ¶23). Plaintiff also disputes that she was ever informed to show the pads she was prescribed on June 22, 2018 to medical. (Doc. 47, ¶23). Plaintiff even complained to nursing staff about not being seen and was told to keep putting medical slips in. (Doc. 47, ¶23). Plaintiff claims that

throughout her time under the care of CCI there were not proper policies, protocols, or supervision in place in order to protect her well-being and safety. As such, plaintiff has put forward a genuine issue of material fact as to CCI's negligence.

### b. Eighth Amendment

Under the Eighth Amendment and then through the Fourteenth Amendment of the United States Constitution, inmates are guaranteed constitutionally adequate medical care while in prison. Pearson v. Prison Health Servs., 850 F.3d 526, 534 (3d Cir. 2017). In order to allege a viable Eighth Amendment deliberate indifference to a medical need claim, a plaintiff must aver: "(1) the existence of serious medical needs; and (2) the official's deliberate indifference to those needs." Ham v. Greer, 269 Fed. Appx. 149, 151 (3d Cir. 2008) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). Significantly, "in the context of deliberate indifference claim[s] based on failure to provide adequate medical treatment, 'it is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference.'" Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 193 n. 2 (3d Cir. 2001) (quoting Rouse, 182 F.3d at 197 (some internal quotations omitted). See also Estelle v. Gamble, 429 U.S. 97,

97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (noting that "in the medical context, an inadvertent failure to provide medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."). "[A]s long as a physician exercises professional judgment, his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

Medical expert testimony for a deliberate indifference claim may be necessary to determine the propriety of a particular diagnosis or course of treatment that would not be apparent to a lay person. Pearson, 850 F.3d at 537-38.

### i. Serious Medical Need

There is a genuine dispute of material fact regarding plaintiff's serious medical need. Defendant claims there was not a serious medical need until

- 16 -

July 20, 2018 when plaintiff was immediately taken to receive emergency care at the hospital. Plaintiff presents expert testimony that there was a serious medical need when plaintiff presented with abnormal bleeding and pain on June 22, 2018 and was not given a pregnancy test nor evaluated for an ectopic pregnancy. Then, from June 23, 2018 to July 19, 2018, plaintiff states that she placed medical slips four to five times per week regarding her pain and abnormal bleeding. (Doc. 47, ¶23). Next, plaintiff is seen on July 19, 2018 for vomiting, bleeding, and pain where her pregnancy test produced a positive result. However, plaintiff, even given her history of bleeding and pain, was not evaluated for an ectopic pregnancy. Plaintiff has alleged sufficient facts to create a genuine issue of material fact pertaining to her serious medical need.

### ii. Deliberate Indifference

A deliberate indifference claim requires the official to both "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and to "also draw the inference. Farmer v. Brennan, 511 U.S. 825, 835-37 (1994). The plaintiff must offer evidence suggesting that the defendant appreciated "the true serious of the risk of harm" or produce evidence suggesting that the defendants' treatment decision about the specific symptoms at issue which they had awareness of was a "substantial

departure from accepted professional judgment, practice, or standards" such that a reasonable jury could conclude that they "actually did not base [their] decision on such judgment." Pearson, 850 F.3d at 539 (citing Youngberg v. Romeo, 457 U.S. 307, 323 (1982). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment [so long as it] remains a question of sound professional judgment." Youngberg, 457 U.S. at 754.

The plaintiff introduces expert evidence pertaining to the appropriate standard of care for her specific symptoms. This is appropriate because the standard of care for a woman presenting with abnormal bleeding and pain is not apparent to a layperson. Pearson, 850 F.3d at 536-37. Dr. Jubanyik explains that the standard of care for a woman of childbearing age presenting with abnormal bleeding and pain requires a pregnancy test and evaluation for an ectopic pregnancy on June 22, 2018. Dr. Jubanyik explains that the symptoms plaintiff presented with would make it apparent even to a third-year medical student to evaluate her for an ectopic pregnancy. As such, plaintiff presents a genuine issue of fact as to weather Dr. Zaloga's actions were "a substantial departure from accepted professional judgment, practice, or standards." Youngberg, 457 U.S. at 323.

- 18 -

For similar reasons, plaintiff's deliberate indifference claim against Mr. Iannuzzi will proceed. Parker was referred to Mr. Iannuzzi on July 19, 2018 after complaints of vomiting for three days and pain in her right side. (Doc. 48, p.11). Mr. Iannuzzi conducted a pregnancy test, which came back positive, and a urine test, which showed a urinary tract infection ("UTI"). (Doc. 48, p.12). Mr. Iannuzzi ordered Zantac, Tylenol, Prenatal vitamins, Clindamycin, an antibiotic for the UTI, Phenergan for nausea, and regular temperature checks for the next three days. (Doc. 48, p.12-13). Plaintiff presents Dr. Jubanyik to produce extrinsic evidence that Mr. Iannuzzi's diagnosis and treatment was a substantial departure from accepted professional judgment, practice, or standards. <u>Pearson</u>, 850 F.3d at 359. The defendants produce expert witnesses to testify that prescribing pregnancy and UTI related medications was the appropriate standard of care. Plaintiff's expert explains that it was "incredulous" that plaintiff was not immediately sent to the emergency room on July 19, 2018 after the positive pregnancy test. Dr. Jubanyik explained, "This failure to consider ectopic pregnancy in Ms. Parker and send her to the emergency department immediately was gross negligence on the part of the Lackawanna medical facility and showed wanton disregard for her safety." (Doc. 36-14, p.2). Dr. Jubanyik further explained that the "standard of care for a medical provider is to consider

ectopic pregnancy in any patient with a positive pregnancy test, recent abnormal bleeding and abdominal pain. Not doing so puts pregnant women in life-threatening situations." (Doc. 36-15, p.2). Therefore, Dr. Jubanyik's opinion is that Mr. Iannuzzi substantially departed from the standard of care, and a reasonable jury could find the same.

Lastly, plaintiff asserts a claim against CCI as the private corporation providing medical services through a contract with Lackawanna County. The Third Circuit has explained:

> There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under §1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." Bryan County, 520 U.S. at 417, 117 S.Ct. 1382 (Souter, J., dissenting). The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." Id. Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Id. at 417–18, 117 S.Ct. 1382 (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989)).

Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003).

First, the plaintiff argues that Dr. Zaloga is the policymaker for CCI

because he has final policymaking authority for medical services provided by CCI. Dr. Zaloga is the only physician employed by CCI. <u>Whitehurst v. Lackawanna Cty.</u>, No. 17-0903, 2020 WL 6106616, at *17 (M.D. Pa. Mar. 5, 2020) (stating Dr. Zaloga is not only the president and chief medical officer of CCI, but he appears to be the only physician employed by CCI). As the policymaker for CCI, if Dr. Zaloga was deliberately indifferent to the plaintiff's serious medical needs, then CCI can be held liable under the second path of liability in <u>Natale</u>.

Second, plaintiff argues that CCI's only written policy for pregnant female inmates pertains to handling already pregnant incoming inmates as opposed to how to evaluate female inmates for pregnancy during their incarceration. (Doc. 46, p.41). There is no apparent policy in place to evaluate female inmates for pregnancy. Plaintiff contends that CCI's failure to adopt a policy for diagnosing and confirming pregnancy in inmates upon incarceration and to evaluate female inmates after being committed to the prison presenting signs of pregnancy constitutes deliberate indifference. <u>Natale</u> explains that a reasonable jury "could also infer that the failure to establish a more responsive policy caused the specific constitutional violation" complained of by Parker. <u>Natale</u>, 318 F.3d at 585. A reasonable jury could infer that a failure to have any policy in place to evaluate female

inmates for pregnancy caused the specific constitutional violation of a failure to timely diagnose and treat an ectopic pregnancy.

### IV.    CONCLUSION

Defendants' motion for summary judgement, (Doc. 36), on all counts will be denied.

An appropriate order shall follow.


                                        *s/ Malachy E. Mannion*
                                        **MALACHY E. MANNION**
                                        **United States District Judge**

**DATE: March 28, 2023**
20-427-01